## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **ETHAN N. VAETH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No** |
| | ) | |
| **REMINGTON ARMS COMPANCY,** | ) | |
| **LLC, REMINGTON OUTDOOR** | ) | |
| **COMPANY, INC., SPORTING** | ) | |
| **GOODS PROPERTIES,** | ) | **COMPLAINT AND DEMAND** |
| **INC., and E.I. DU PONTE DE** | ) | **FOR JURY TRIAL** |
| **NEMOURS & COMPANY.** | ) | |
| | ) | |
| **Defendants.** | ) | |

COMES NOW Plaintiff, by and through his attorneys, COOK, BARKETT, PONDER & WOLZ, L.C. and for his claims for relief against Defendants, states and alleges as follows:

### PARTIES

1.      Plaintiff Ethan Vaeth is a citizen and resident of Ste. Genevieve County, Missouri.

2.      Defendant Remington Arms Company, LLC is a Delaware Corporation with its headquarters and principal place of business in Madison County, North Carolina.  It is not a citizen of Missouri, but it conducts business without limitation in Missouri.

3.   Defendant Remington Outdoor Company, Inc. ("ROC") is a Delaware corporation with its principal place of business in Madison, North Carolina.  It is not a citizen of Missouri, but it conducts business without limitation in Missouri.

4.     Defendant Sporting Goods Properties, Inc. ("SCPI") is a Delaware corporation with its headquarters and principal place of business in Wilmington, Delaware. It is not a citizen of Missouri, but it conducts business without limitation in Missouri.

5.   Defendant E.I. du Pont de Nemours & Company ("DuPont") is a Delaware corporation with its headquarters and principal place of business in Wilmington, Delaware. It is not a citizen of Missouri, but it conducts business without limitations in Missouri.

6.     Defendants were, and now are engaged in the business of designing, manufacturing, assembling, distributing, marketing, and selling firearms, and in this regard did design, manufacture, distribute, market, sell and, place into the stream of commerce, the Remington Model 710 Bolt Action Rifle including the action, fire control system, safety, and bolt lock bearing Serial Number 71136874 ("Rifle"), knowing and expecting that said Rifle would be used by consumers and around members of the general public.

7.   Prior to December 1, 1993, DuPont owned 100% of the stock in the company then known as Remington Arms Company, Inc., now known as Sporting Goods Properties, Inc. ("SGPI").  On or about December 1, 1994, Remington Arms Acquisition Corporation, Inc. ("RACI") purchased from DuPont substantially all of the income producing assets of Remington Arms Company, Inc. (now known as SGPI), including the corporate name.  the company formerly known as Remington Arms Company, Inc. changed its name to Sporting Goods Properties, Inc. and RACI changed its name to Remington Arms Company, Inc.

SGPI retained certain non-income producing assets, some with significant environmental and other liabilities such that its net worth was reduced to a small fraction of its former so that SGPI now has a negative worth and may not be able to pay reasonable judgments in this and similar litigation.

8.      At all times pertinent to this action, SGPI and DuPont were and are the alter ego of each other and in essence constitute one legal entity in which SGPI operates as a division of DuPont.  The separate incorporation of SGPI is a sham in that it is merely a corporate veil which insulates DuPont from liability for products manufactured and sold by SGPI.  DuPont exerted, and currently exerts extreme influence, complete dominion, and/or absolute control over the corporate activity and function of SGPI.  DuPont's continued operation of SGPI as a separate legal entity is a subterfuge designed to defeat public convenience, justify a wrong, perpetrate a fraud and/or otherwise work an injustice on Plaintiff herein and the general public.  The conduct of DuPont and/or SGPI has harmed or will harm Plaintiff and the general public, justifying piercing of the corporation veil resulting in DuPont being liable for the acts and omissions of SGPIas they are in reality one legal entity.

9.      Defendants Remington, ROC, SGPI, and DuPont are so intertwined contractually for the liabilities, past, present, and future, of each other that they are, in fact, one entity and therefore, the corporate veils of each company should be pierced to properly ascertain the responsible parties for the allegations contained herein.  The Asset Sale/Purchase Agreement transferring the assets of SGPI to Remington and various revised or supplemental agreements, spreads responsibility and authority for product liability

claims among the three entities as it is unclear who bears the contractual liability for the claims alleged herein.

10.     The Remington entities and/or DuPont expressly and impliedly agreed to assume certain debts and responsibilities of SGPI, including the product liability for the Rifle involved in this action, by the terms of the Asset/Sale Purchase Agreement, Assumption Agreement, and other related agreements, as well as the continuing relationship between the Remington entities, DuPont and SGPI.  Consequently, DuPont and/or the Remington entities are the corporate successors SGPI and have assumed liability for the product liability claims asserted, now and in the future, against SGPI, including this action.

11.     Remington, DuPont, and SGPI acted fraudulently with respect to the asset/sale purchase in that its purpose was to avoid and/or limit the responsibility of DuPont and/or Remington for the debts of SGPI, particularly its product liability.  Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

12.     At all times pertinent to this action SGPI was an agent of DuPont acting in the course and scope of its agency relationship thereby making its principal, DuPont, liable for all SGPI's acts and omission, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

13.     At all times pertinent to this action, agents of DuPont, acting within the course and scope of their agency relationship, controlled SGPI, thereby making SGPI's

acts and omissions those of their principal, DuPont, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

## JURISDICTION AND VENUE

14.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Every issue of law and fact in this action is wholly between citizens of different states. The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendants as Defendants maintain significant contacts with this judicial district by virtue of conducting business within this district and because Defendants manufactured and sold the defective rifle that caused injury and damage to Plaintiff in Missouri, and Defendants, at the time of placing the Rifle into the stream of commerce, could have foreseen, realized, expected, or anticipated that the product might eventually be found in Missouri by reason of its nature and Defendants' marketing practices.

16.     Venue is proper within this district because a substantial part of the events or omissions giving rise to the claim occurred within Ste. Genevieve County, Missouri.

## COMMON ALLEGATIONS

17.     Ethan Vaeth was severely injured on November 24, 2019, when the Rifle, with the safety engaged, fired without a trigger pull.

18.     The Rifle was and is owned by Kalin Cassoutt. The Rifle was manufactured and sold by Defendants with a fire control or trigger system known as the "Walker" fire control or trigger system.

19.     The Rifle, with the Walker fire control system, is unreasonably dangerous and defective in that it may, and in this instance did, fire without a trigger pull.

20.     During the morning of November 24, 2019, Ethan Vaeth, and his friend, Kalin Cassoutt were deer hunting in northern Missouri.  Plaintiff and Cassoutt were traveling in a Polaris Ranger UTV with the Rifle resting on the floorboard of the vehicle with the muzzle pointing upward.  Plaintiff had his left arm stretched out over the seat of the UTV.  While they were driving, the Rifle discharged without warning striking Plaintiff in the left arm above the wrist causing serious injury.

21.     Plaintiff Ethan Vaeth's damages include past and future medical expense, mental and physical pain and suffering, permanent disability, disfigurement, emotional and mental distress, and other general special damages in an amount to be determined by the jury at trial of this action.

## <u>REMINGTON MODEL 700 and 710 "WALKER" FIRE CONTROL</u>

22.     The "Walker" fire control or trigger system was designed by Defendants with an internal part called a "trigger connector."  The connector is "resiliently mounted", which means that it is not affixed or attached to the trigger body.  The connector is held against the trigger body by a small spring known as the trigger return spring.  The connector and trigger body are completely enclosed by metal side plates.

23.     The connector sits under and supports the sear with a minimum specified overlap of 20/1000ths of an inch.  The sear in its upright position maintains the firing pin in a cocked position.  When the sear falls, the firing pin is released and the rifle fires.  The rifle will fire without a trigger pull if the connector is not in its proper position and does

not adequately support the sear when the safety is released.  Each time the rifle is intentionally fired with a trigger pull, the connector separates from the trigger body, creating a gap between the connector and trigger body.  According to Defendants' internal documents and prior testimony, it is known and foreseeable that contaminants can become trapped inside the enclosed housing, such as field debris, manufacturing scrap, burrs from the manufacturing process, lubrication that congealed after it was applied at the factory, order lubrication build up, moisture, and other interferences and materials, that cause the trigger connector and trigger system to improperly function.  Other factors that can restrict the proper retraction of the connector to secure and reliable sear support position include insufficient sear lift, slip fit of the connector on the trigger body, binding of the trigger body, and/or trigger connector on the side plates of the housing, binding of the connector on the trigger body, rust, and salt bleed out from power metal parts used in the fire control. Defendant's records and prior testimony clearly acknowledge that without a secure and reliable sear and connector engagement, the rifles can and will discharge without a trigger pull.

24.    The trigger connector feature used in the Walker fire control is unique in the world of firearms and has only been used by Remington.  No other modern firearm manufacturer uses a connector or other two (2) piece trigger construction.

25.    Remington's internal records and prior testimony establish that Remington has received over 9,000 customer complaints that Remington rifles containing the Walker fire control have fired without a trigger pull between 1992 and 2018, which is an average of 6 customer complaints per week for 27 years.  The total number of complaints is known

to be higher because Remington has destroyed some of the customer complaint records for earlier years. Based upon reliable information and belief, there have been many more unintended firings of Remington rifles containing the Walker fire control.

26.     The model 710 riles use the same trigger mechanism as the model 700 rifles and are subject to the same complaints and defects.

27.     Remington's internal records also acknowledge that brand new Model 700 and 710 rifles have fired without a trigger pull during final testing or "gallery testing" inside Remington's factory. Remington's gallery testing documents describe "Safety malfunction found in our gallery on new rifles." Between the years 1970-1974, an internal Remington document, under the heading "Justified Complaints", reports 77 brand new Model 700 rifles fired without a trigger pull "when safe is pushed off." In addition, the document reported 66 brand new Model 700 rifles fired without a trigger pull when the rifle was jarred, or the bolt was operated.

28.     Gallery test data on brand new Model 700 rifles from documents produced by Remington for factory testing from 1974-1991 shows 125 incidents of "fire on safety release", 375 incidents of "follows down", 447 incidents of "fails to connect", and 486 incidents of "light blow."

29.     Ken Soucy was employed by Remington and held various high-level positions with Remington from the 1970's and throughout the 1990's. an e-mail from Ken Soucy discussed the CNBC documentary "Remington Under Fire," which reported on defects in Remington Model 700 rifles which cause the fires to fire without a trigger pull. Mr. Soucy states "[w]hat surprised me about the CNBC piece was their failure to mention

a very damaging piece of evidence, that being the numerous FSR (fire on safety release) incidents in Remington's own factory, mostly on brand new guns. These occurred due to a tiny sliver of metal being created during the fire control assembly operation. That sliver would get lodged in a position that the trigger would not return to the neutral position. The safety was then released and … BAM. In the field, any foreign object of about the same size could, and probably has, produced the same result. <u>If Remington has managed to shield these incidents from your discovery process, they have done a pretty thorough job of "cleaning things up."</u>

30.    Defendant has not produced the documents referred to by Ken Stoucy in his email despite requests to do so in discovery in other Remington Model 700 litigation.

31.    Remington sold approximately 5 million Remington Model 700 rifles with the Walker fire control beginning in 1962. All of the bolt action rifles containing the Walker fire control including the model 710 are unreasonably dangerous and defective because all of them can fire without a trigger pull under various foreseeable circumstances.

32.    Defendant has known that the Walker fire control can allow the rifle to fire without a trigger pull since at least 1947. The occurrence of safety related malfunctions has been so persistent and common that Defendants have created internal acronyms to use when discussing the various ways, the fires may fire without a trigger pull.

33.    Defendants' records show that numerous acronyms have been created by Defendants to describe unintended firings (without a trigger pull) including: fire on safety release – "FSR", fire off safe – "FOS," jar off – "JO", fire on bolt opening – "FOB", fire on bolt closing – "FBC", and "fails to fire", which refers a failure of the rifle to fire when

the trigger is intentionally pulled but the rifle then fires when the bolt or some other part of the rifle is touched.  Defendants also used the acronym "FD" for a "follow down" which refers to a malfunction that allows the firing pin to be released when the bolt action is cycled.

34.     Mike Walker was an engineer employed by Defendants from the early 1940's to the 1970's. Walker was the primary design engineer for the "Walker" fire control or trigger system.  Walker testified as follows:

> Q.     Now would you agree with the proposition that in the design of the fire control system for a rifle, that the number one criteria by which it should be judged is Safety?
>
> A.     Yes.
>
> Q.     And there really isn't anything second place when it comes to safety, would you agree with that?
>
> A.     That's right.
>
> Q.     In other words, that rifle must and should be designed as safely as it possibly can be designed, is that correct?
>
> A.     True.
>
> Q.     And if the design does not meet the criteria of safety, then it is a faulty design; would you agree with that?
>
> A.     Yes.
>
> Q.     Now is it essential to the safety of the Remginton 700 that the trigger and trigger connector come back to rest beneath the sear whenever the rifle is on the safe position?
>
> A.     Yes.
>
> Q.     Why?
>
> A.     Because when the safety is released, it lets the sear down onto the trigger connector, and if the trigger connector is not there, of course, the rifle would fire.
>
> Q.     Let's say – let's talk about the Remington 700.  Let's assume that the trigger and trigger connector does not come back beneath the sear.
>
> A.     The trigger did not reconnect.
>
> Q.     Did not reconnect.  And the operator takes the rifle from a position of safe, on safe to off safe.  What happens then is that the safety lever in essence becomes a second trigger; isn't that right?
>
> A.     You could say that.

Q.    And you knew that, did you not, whenever you designed the 700 rifle?

A.    Yes.

Q.    And Remington management knew it whenever it designed and manufactured and distributed the 700 rifle; is that correct?

A.    I assume they did.

Q.    As the designer of the 700, would you have had the access, the right, if you will, to make suggestions about changes to the Operator's Manual?

A.    Yes.

Q.    And on occasions you did, didn't you?

A.    Yes.

Q.    So that had you chosen to warn the operator about this circumstance, the possibility of this circumstance, which is set forth in this patent, namely that the trigger connector and trigger might not return underneath the sear, you could have done so?

A.    I could have.

Q.    Would it be a fair statement to say that you deliberately did not do so?

A.    Yes.

Q.    Would it be a fair statement to say that Remington management deliberately chose not to warn the shooting public of this possibility?

A.    Yes.

Q.    And that they did it with actual knowledge that it was a possibility?

A.    Yes.

35.    Defendants have failed to warn the public and Plaintiff that the Rifle and all other Model 700 rifles with the Walker fire control can and will fire without a trigger pull.

36.    Defendants knew that the bolt lock mechanism used in conjunction with the Walker fire control was also unreasonably dangerous and defective.  In 1956, Remington meeting minutes described how "a major stumbling block has developed in the Model 721 and 722 safety which is now considered inadequate."  As a result, Remington released the Model 725 with a three-position safety which permitted the gun handler to unload the rifle with the safety in the "On Safe" position.  Remington nevertheless abandoned the three-

position safety design and again used a two-position safety with a bolt lock that it considered "inadequate" when it released the Model 700 in 1962.

37.    Remington had a Product Safety Subcommittee (PSS) whose purpose was to identify "known or suspected" product safety deficiencies.  The PSS reviewed Model 700 customer complaints and various test failure documents and requested "safety audits" to determine the failure rate of Model 600 and 700 fire controls.  The PSS Committee had full authority to issue directives for corrective action including issuing warnings and recalls.

38.    Remington's documents, including PSS Committee meeting minutes, demonstrate Remington's knowledge of defects and design deficiencies caused by interferences between the components of the Model 700 fire control.

39.    For example, minutes for the January 22, 1980, PSS Committee meeting state the following:

> Pending litigation involving claims against guns subject to recall was discussed. The current status of Remington's audit on the Model 700 was also presented, which showed that from June 13, 1978, to January 15, 1980, 3,376 Model 700's returned to Ilion for service were tested for the "trick" condition.  Of this sample, 35 guns failed the "trick" test.  But of these 35 guns, 22 guns were trickable because they had been altered or damaged out in the field.  This means that the audit to date indicates that only about 4% of the audited Model 700's were susceptible to tricking due to causes not attributable to customer misuse.  It is also known that only /4% of the guns manufactured before 1975 are so susceptible. Since, January of 1979, Ilion has added a new test to the Model 700 audit which involves turning the returned Model 700 on its back and inserting a screwdriver into the trigger assembly and attempting to trap the connector so that it cannot move freely back under the sear.  In this condition, the gun will fire when the safety lever is moved to the "fire" position.  This has been termed "firing off safe". Since the inception of the new test, 38 returned Model 700's were found to "fire off safe", but of this number, only 9 would do so because of causes not attributable

to alternation or damage in the field – 4 of which were guns manufactured before 1975.

Even if you combine the number of "trickable" guns with the number of guns that will "fire off safe", the figures indicate that approximately .6% of the Model 700's currently in the field will be susceptible of "tricking" or "firing off safe".

40.     The "new test" referred to in the January 22, 1980, PSS Committee meeting minutes is referred to by Remington as the "screwdriver test."  The "screwdriver test" is a test designed by Remington to detect manufacturing defects in a rifle that can cause the rifle to fire without a trigger pull when the safety is release.

41.     The Rifle is dangerous and defective because it was manufactured by Defendants with an Improper fit between the connector and trigger body and insufficient sear lift which caused the Rifle to fire without a trigger pull when the safety was released.

42.     The Rifle is one of the defective rifles in the hands of customers referred to in the minutes to the January 22, 1980, PSS Committee meeting quoted in paragraph 39 of this Complaint.  The Defendants knew there were dangerous and defective rifles in the hands of the public, including the Rifle in this case, but Defendants failed to recall the rifles, including the Rifle in this case, and failed to warn the Plaintiff and the public of the dangerous and defective condition of the Rifle and others like it.

43.     Defendants have not only failed to warn, but have affirmatively deceived Plaintiff and the public by claiming they have no knowledge of the dangerous and defective conditions that allow rifles manufactured with the Walker fire control to fire without a trigger pull.  Specifically, Defendants have repeatedly falsely claimed that the Model 700 rifle, and other rifles with the Walker fire control, cannot fire without a trigger pull unless

the Walker fire control has been improperly adjusted or the rifle has been improperly maintained by the rifle owner.

44.     The Rifle has not been improperly maintained.  The Rifle's trigger pull weight and over travel screws have not been improperly adjusted since leaving Defendants' factory.  The owner's manual for the Rifle included instructions explaining how to adjust the trigger pull weight for the Rifle and does not tell owners to not adjust the amount of engagement between the connector and sear.

45.     Defendants have also deceived the public by falsely claiming that no one has ever been able to replicate the unintended firing of a Model 700, and other rifles with the Walker fire control, without a trigger pull unless the Walker fire control has been improperly modified or improperly maintained.

46.     In 1995, Remington hired H.P. White Laboratory, Inc. to perform expert testing of the Walker fire control and a proposed new, modified fire control assembly that was intended to improve the functional reliability of the Model 700 rifle.  The tests subjected the fire control assemblies to temperature and environmental conditions in accordance with Remington protocols.  The results showed that both the Walker Fire Control and the modified trigger assembly "were adversely [a]ffected by the environmental extremes (sand and dust)."  The report of the testing concluded that "inadvertent firings may be an infrequent random phenomena created by debris which is cleared by the subsequent manipulation of the Fire Control Group."

47.     Defendants have intentionally manufactured and sold the Model 700 and 710 rifle for use by hunters and target shooters.  Defendants knew during the design of the

Walker fire control that their rifles would be used in adverse environmental conditions and have an obligation to design in its rifles to remain safe in adverse environmental conditions. The patent application for the Walker fire control acknowledges that a fire control must be designed to have "a construction which is absolutely safe in the hands of the hunter or target shooter and rugged enough to remain so in spite of the abuse and neglect which are often heaped upon sporting arms."

48.     During testing, H.P. White Laboratory, Inc. also determined that clean rifles could inadvertently fire when the safety is release. Remington's hired experts reported that two clean rifles "fired" when the safety was released. H.P. White reported to Defendants that "[d]uring post-test cleaning, two of the cleaned guns (one each Modified and Control), serial Numbers 6212893 and 6212870, malfunctioned in a manner which, had they been loaded, would have resulted in an advertent firing." "When the safety was moved from the 'safe' to the 'fire' position, the firing pin fell without manipulation of the trigger." "[T]he rifles 'fired' inadvertently with the release of the safety . . ."

49.     Defendants' internal documents, including memos, committee meeting minutes, testing records, research and development records, design change requests, process record change authorization forms, customer complaint memo's, gallery test failure report, and gun examination reports, clearly show that the Walker fire control is unreasonably dangerous and defective because it allows Remington bolt-action rifles, including Model 710 rifles, to fire without a trigger pull under foreseeable circumstances.

50.     Defendants designed the Walker fire control trigger assembly and began manufacturing and distributing firearms containing that trigger assembly in March of 1948.

Internal Remington documents show that Defendants knew of the dangers of the trigger assembly before any rifle using Walker fire control was first sold.  Almost immediately following the first sale of rifles containing the Walker fire control system, customers reported that the rifles were firing without a trigger pull.

51.      Despite knowledge of the dangerously defective design of the trigger assembly, Defendants continued to produce rifles with the Walker fire control design including the Rifle which injured Plaintiff.

52.      Defendants started selling the Model 700 rifle in 1962.  In March 1968, Consumer Reports wrote an article describing Model 700 rifles firing without a trigger pull when the rifle when the safety was released.  Defendants denied any knowledge of propensity of the rifles to fire without a trigger pull.

53.      In 1978, Remington settled a personal injury case brought by John Coates who was paralyzed by an unintended firing of a Model 600 rifle, for $6.8 million.  The Model 600 series rifle utilized the same trigger assembly design as the Walker Fire Control in the Model 700 and 710, with an independent trigger connector.  Only the dimensions of the parts were different.  Shortly after the settlement, Remington decided to recall all of its Model 600 series rifles.  Defendants had sold far fewer Model 600 rifles than Model 700 rifles.

54.      Remington considered conducting a similar recall of the more popular Model 700 rifle, but internal documents show that Remington opted not to recall the Model 700 rifles with the dangerous trigger assembly design even though its own internal testing determined that Model 700 rifles would fail the same tests as the Model 600.  Defendants

had sold approximately 2,000,000 Model 700 rifles at that time.  Remington not only decided not to recall the Model 700, and not to warn the public about the defective rifles, but also decided to continue to produce and sell the Model 700 with dangerous and defective Walker fire control.

55.     Instead of recalling the Model 700 rifles or at least warning the public, Defendants focused their efforts on creating a safe gun handling defense to personal injury and death claims that Defendants knew would occur.  In furtherance of its efforts, Remington had the firearms manufacturing association known as SAAMI modify the "10 Commandments of Gun Safety" to try to shift responsibility for personal injuries or death to the gun handler rather than recalling and fixing the Model 700 rifles.  SAAMI added a new Commandment of Gun Safety to "Don't rely on your firearm's safety."

56.     Throughout the 1970s, Remington continued to consider after alternative designs and enhancements to the Walker Fire Control System.  An internal memo dated November 16, 1978, states: "The following design requirements for a new fire control bolt action rifles were tentatively established – eliminated the 'trick' condition.  At this point the best solution appears to be adding a trigger block to the safety cam mechanism.  This would prevent the trigger from moving in the 'safe' position – eliminating the 'fail' to reset' possibility."  The document goes on to recommend that the new fire control should be "retrofittable" to the Model 700.

57.     Remington 1980-1981 Firearms Research Division schedule lists as a "necessity" "fire control improvement" because it was "necessary to reduce product

liability." These new designs all centered on the concept of moving the floating connector and incorporating a trigger block to force full engagement of the trigger and sear.

58.     A telling comment in a September 2, 1981, memo regarding proposed design changes to the Model 700 fire control states "Need "safe safety?"". Remington knew that the Model 700 fire control was not safe and that they needed a "safe safety", but failed to warn the public and failed to make the Walker fire control safe.

59.     Remington removed the bolt lock from the Model 700 in 1982 to allow the rifles to be Unloaded without releasing the safety. The removal of the bolt lock did not remedy the essential defect of the rifle firing without a trigger pull. The modification simply allowed users to cycle the bolt and unload the rifle with the safety on. Remington removed the bolt lock because it knew that the rifles had a propensity to fire when the safety was released.

60.     Remington considered changing the defective design of the Walker fire control by removing the connector and including a safety that blocked both the trigger and the sear, but internal documents show that Remington decided to put its financial interests over the health and safety of the consuming public.

61.     On December 30, 1985, an internal document states "R & D is working on improved safety and security features which should have marketable value. (If they don't, we ought to stop the work.)." Unfortunately, work on the new design stopped shortly after the issuance of this memorandum. Instead, internal hand-written notes from an October 19, 1993, document titled ("Liability Point of View") demonstrate that Remington was not

concerned about safety, but rather about having a "readily defensible reason for departure from current design."

62.     In 1994, a jury rendered a $17 million verdict against Remington based on the Model 700 Trigger assembly design defect.  The jury had evidence that Remington had developed a safer trigger assembly for the Model 700, but never marketed a rifle with that safer assembly.  After the verdict, internal Remington documents pose a simple question: "IS THE RIFLE SAFE?"  Remington ultimately did the math and determined that if only 30% of its customers actually returned the rifles as part of a nationwide recall of the Model 700 bolt action rifles, it would still cost Remington $22.6 million to conduct the recall. Remington decided against a recall.

63.     In 1995, Remington documents reveal that further efforts to redesign the Walker Fire Control trigger assembly were underway.  Remington's Fire Control Business Contract of January 27, 1995, provided (emphasis added):

> The goal is to provide a fire control that "feels" the same to our customers
> Yet provides additional safeguards against inadvertent or negligent discharges.
> The purpose of the redesign of the fire control is to reduce the number of parts
> Required, lower costs and to add design characteristics that enhance the safety
> attributes of our firearms.

64.     Under "Financial Analysis" the contract states: "This is where the rubber meets the road.  Is the project worth doing? What are the minimum forecasts to ensure profitability and does our pricing structure support these expected profits?"

65.     This sentiment was echoed by Robert Haskin, Remington's former general counsel and vice-president of marketing, who testified in *Bledsoe v Remington, et al,* (MD GA, CV 00069) that: "[i]t was my opinion that the new product was only worth doing if

we could achieve certain goals, one of which was that it costs the same or less, another was that we could make certain improvements on the product, which you asked me to characterize, and I said my opinion could fairly be characterized as safety issues."

66.     While Remington on the one hand took the position that any redesign of the Walker Fire Control trigger assembly was focused on addressing safety issues, maintaining profit was a primary concern.

67.     Remington decided to introduce a new rifle series to the consuming public – the Model 710 in the 1990's.  When designing the Model 710, Remington evaluated what fire control system to employ in the new product.  In 1997, the answer was straight forward – "Not the M700 fire control."

68.     An internal February 1998 memo shows that Remington considered the costs to change their manufacturing process to produce a safer trigger assembly. Remington determined that to change the trigger assembly would require "fairly substantial investments in capital and technical resources" to increase their processing capabilities in Ilion, New York.  In May 1998, the new trigger design was put on hold by Remington management "until economics and [the] project is approved."

69.     On August 25, 1998, Remington abandoned implementation of a new, safe trigger design because of an "estimated cost increase."  Instead, to "eliminate development cost and time," Remington used the dangerously defective Walker Fire Control mechanism in the Model 710, completely reversing its decision made just eighteen months earlier to "Not [use] the M700 fire control."

70.     During pilot testing of the Model 710 rifle, internal Remington documents reveal that on more than one occasion the rifles fired upon bolt closure and fire when the safety was moved from the safe to the fire position.  Despite these internal testing failures, Remington introduced the Model 710 rifle to the consuming public in 2000.  Because Remington knew of the foreseeable dangers of the Model 710 rifle, it issued an order to its customer service department regarding how to handle customers who called complaining of unintended firings.

71.     On October 20, 2010, after a ten-month investigation, CNBC aired a documentary entitled, "Remington Under Fire: A CNBC Investigation," alleging that for almost 60 years, Remington had been aware of the trigger assembly defect that caused rifles with that assembly to fire without a trigger pull.  The story described dozens of deaths, scores of injuries, and more than five thousand customer complaints that had been linked to the alleged problem.  The documentary included an interview with Mike Walker, the Remington engineer who designed the Walker Fire Control trigger used in the Model 700 rifle and described Walker's internal company memos where he repeatedly raised concerns, even after he retired from Remington, about the trigger system he designed.  Another former employee told CNBC that he was instructed not to acknowledge any problem with the rifle because, if he had, he would have lost his job.

72.     Remington responded that unintended firings from the Model 700 rifle were the result of poor maintenance and unsafe handing, often by inexperience users.

73.     Remington gave a written statement to CNBC before the documentary aired that contained statements that Remington knew were false when they were made:    1) that

the Model 700 was free of any defects, and 2) no expert has even been able to duplicate any claimed firing without a trigger pull on guns which had been properly maintained and which had not been altered after sale.

74.     After CNBC aired the documentary, Defendants published several responses, including a website located at http://remington700.tv, an Official Statement for CNBC Program regarding the Model 700, and a Point-by-Point Response to the CNBC documentary.   These responses contained false and deceptive statements intended to deceive the public, including the claim that Remington Model 700 rifle is a safe and reliable firearm that can only fire without a trigger pull when the rifle is improperly modified or maintained.   Remington's response also falsely claimed that every incident cited by CNBC involved a breach of one or more important gun safety rules, concluding falsely that "The truth about accidental discharges is clear.   These things don't go off by themselves." Remington asserted that the Model 700, including its trigger mechanism, has been free of any defect since it was first produced, and no scientific test had ever supported the accidental discharge theory of plaintiff's lawyers and their experts.

75.     In these responses, Defendants fraudulently continued to state that Remington rifles containing the Walker fire control systems were safe and can only fire without a trigger pull when they are improperly modified or improperly maintained.

76.     Remington finally began manufacturing Model 700 rifles with a new fire control system called the "X Mark Pro" in 2006.  Before that time Remington considered changing the name of the "safety" rather than making the fire control safe.

77.     A Remington internal meeting memo states, "One of the items discussed at this meeting was the use of the word "safety" to describe the mechanism used to block the trigger or the sear or the firing pin."  "It was the consensus that the work "safety" should not be used and that other terms should be submitted.  Some were suggested such as, trigger block, lock, stop, interrupter number, disconnector, intersector, switch arrester, latch, etc."

78.  Defendants manufactured and sold the Rifle knowing that it was defective and unreasonably dangerous.

79.     Despite its own internal knowledge of the dangers of the Walker fire control and the bolt lock feature on the Rifle, Remington has never warned users of the dangers of using the Model 710 and 710 and has never publicly admitted that the trigger system is dangerously defective.

80.     Defendants' false and fraudulent statements and actions were designed by Defendants to prevent inquiry and escape investigation into defects in Remington rifles. Defendants' false and fraudulent statements and actions taken to hide damaging internal documents from the public were designed to mislead the public, including Plaintiff, and to hinder the acquisition of information concerning defects in Remington rifles.

81.     Plaintiff did not know that the Rifle or that Remington Model 700 and 710 rifles in general could fire without a trigger pull and were unreasonably dangerous and defective until after the incident described above.

## **COUNT ONE**

## **STRICT POLICY LIABILITY**

82.     Plaintiff hereby incorporates by reference all prior allegations of the complaint as if fully set forth herein.

83.     Defendants manufactured, marketed, and sold the Rifle in a defective condition unreasonably dangerous to the user or consumer.

84.     At all relevant times, Defendants were engaged in the business of designing, manufacturing, assembling, distributing, and selling firearms, and in this regard, did design, manufacture, distribute, sell, and place into the stream of commerce the Rifle, knowing and expecting that the Rifle would be used by consumers including Plaintiff and members of the general public.

85.     The Rifle was expected to and did reach Plaintiff without substantial change in the condition in which it was sold.  Trigger pull and overtravel were within factory specifications.  Connector/sear engagement was not adjusted after the Rifle left the factory.

86.     Defendants' design and manufacture of the Rifle was defective and unreasonably dangerous.  The Rifle was defective when it was sold by Defendants.

87.     Defendants failed to provide adequate warnings or instructions regarding the Rifle.

88.     Plaintiff had no knowledge of these defective and dangerous conditions and had no reason to suspect the Rifle was defective or unreasonably dangerous.

89.     As a direct and proximate result of the defective and dangerous condition of the Rifle, and defendants' failure to adequately warn or instruct, Plaintiff has and will suffer general and special damages in an amount to be determined by the jury at trial of this action.

90.     Defendants are strictly liable to Plaintiff for Plaintiff's general and special damages resulting from Defendants' sale of the Rifle in a defective condition unreasonably dangerous, and Defendants' failure to adequately warn and instruct.

## COUNT TWO

## NEGLIGENCE

91.     Plaintiff hereby incorporates by reference all prior allegations of the complaint as if fully set forth herein.

92.     Defendants had a duty to Plaintiff to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, and marketing of the Rifle.

93.     Defendants breached their duty to Plaintiff by designing, manufacturing, advertising and selling the Rifle, which is defective and has the propensity to fire, and did fire, without a trigger pull, by failing to adequately warn Plaintiff and other users, and by failing to promptly remove the Rifle from the marketplace or to take other appropriate remedial action.

94.     Defendants knew or should have known that the Rifle was defective, has the propensity to fire without a trigger pull, and otherwise is not as warranted and represented by Defendants.

95.     As a direct and proximate cause of Defendant's negligence, Plaintiff has suffered general and special damages in an amount to be determined by the jury at trial of this action.

## COUNT THREE

## PUNITIVE DAMAGES

96.     Defendants knew or should have known of the defective, unreasonably dangerous conditions of the Rifle and the Walker fire control and the damage and injuries that were likely to occur as a result of the defects and failure to warn.  Nonetheless, the defects were not corrected by Defendants, nor did Defendants warn the public about these defects and the risk of serious harm they posed.  Instead, Defendants deliberately and intentionally concealed such information from Plaintiff and the public.

97.     Defendants acted with reckless and outrageous conduct and with reckless indifference in that Defendant had knowledge of facts and intentionally disregarded facts that created a high probability of serious damage to Plaintiff and deliberately proceeded to act in conscious and intentional disregard of, and in difference to, the high probability of serious injury to Plaintiff, and deliberately proceeded to act with indifference to the high probability of serious injury to Plaintiff.

98.     Defendants further knowingly made false representations concerning the safety of the Remington Model 700 and 710 rifle, and concealed material facts concerning the fact that the rifles could fire without a trigger pull causing injury to Plaintiff.

99.     As a result, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment, jointly and severally, against the Defendants as follows:

1. For general and special damages in an amount to be determined at trial.

2. For punitive damages in an amount to be determined at trial.

3. For costs and expenses.

4.  For such and further relief as the Court deems just and proper.

DATED this 27th day of August 2021.

COOK, BARKETT, PONDER AND WOLZ, L.C.


By:   /s/ *Matthew D. Glenn*
       Matthew D. Glenn  #53671
       1610 North Kingshighway, Suite 201
       P. O. Box 1180
       Cape Girardeau, MO 63702-1180
       Phone: 573/335-6651  Fax : 573/335-6182
       Email:  mglenn@cbpw-law.com
       Attorneys for Plaintiff


## DEMAND FOR JURY TRIAL

Plaintiff, by and through his attorney, hereby demands a trial by jury in the above-entitled cause

COOK, BARKETT, PONDER AND WOLZ, L.C.


By:   /s/ *Matthew D. Glenn*
       Matthew D. Glenn  #53671
       1610 North Kingshighway, Suite 201
       P. O. Box 1180
       Cape Girardeau, MO 63702-1180
       Phone: 573/335-6651  Fax : 573/335-6182
       Email:  mglenn@cbpw-law.com
       Attorneys for Plaintiff